IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM ANDERSON BURGAMY IV,<br><br>*Defendant*. | Criminal No. 1:20-cr-150<br><br>Hon. T.S. Ellis, III<br><br>Sentencing: November 20, 2020 |

## UNITED STATES' POSITION ON SENTENCING

*"Even with Corona Virus the shop is running at full speed."*

> *March 30, 2020, William Burgamy boasting about his illegal
> Darknet opioid business continuing during the pandemic*

*"You know I'll take care of it . . . . You'll be sole pharmacy, you got my word."*

> *February 25, 2020, William Burgamy assuring co-conspirator
> Hyrum Wilson that the attack operation in Nebraska would occur*

*"Burgamy warned that he would never surrender to law enforcement, that if anyone showed up during the attack, he would 'blast [his] fu\*\*king way out,' and that he would shoot bullets at anyone who attempted to confront or apprehend him, including the owner of the victim pharmacy."*

> *July 10, 2020 Statement of Facts, signed by William Burgamy*

*"Prior to Burgamy's arrest in April 2020, Burgamy admitted that he and Wilson fully intended on the attack occurring after COVID-19 restrictions were lifted."*

> *July 10, 2020 Statement of Facts, signed by William Burgamy*

*"It stings every time I introduce myself to a stranger and they follow it with 'Hey, aren't you the pharmacist they tried blowing up?' . . . . Why?  Why me?  What had I done to them? . . . . Why would someone want to do this to me and my staff?"*

> *November 2020 Victim Impact Statement from Pharmacist C.K.*

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G."), hereby provides its position with respect to sentencing for William Anderson Burgamy IV ("Burgamy" or "the Defendant"). The government has reviewed the Presentence Investigation Report (the "PSR") and agrees with the U.S. Probation Office that the Defendant's advisory Guidelines range is 210 to 262 months' imprisonment. PSR ¶ 93. The United States submits that a below-Guidelines term of imprisonment of **15 years** (**180 months)** would be sufficient and not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a).

## I.      FACTUAL SUMMARY

Burgamy and his co-conspirator Hyrum T. Wilson ("Wilson") conspired to use explosives to firebomb and obliterate a competitor pharmacy in Nebraska. Burgamy warned Wilson that he would never surrender to law enforcement, that if anyone showed up during the attack, he would "blast [his] fu\*\*king way out," and that he would shoot bullets at anyone who attempted to confront or apprehend him, including the owner of the victim pharmacy. Prior to Burgamy's arrest in April 2020, Burgamy admitted that he and Wilson fully intended on the attack occurring after COVID-19 restrictions were lifted.

From August 2019 through April 2020, Wilson (who was a licensed pharmacist at the time) illegally mailed over 19,000 dosage units of prescription medications, including opioids, from his pharmacy in Nebraska to the Maryland residence of Burgamy. Burgamy illegally sold prescription drugs through his Darknet vendor account to customers nationwide, including here in the Eastern District of Virginia, and claimed at one point that he made nearly $1 million total. Burgamy and Wilson laundered the proceeds of their scheme using Bitcoin cryptocurrency payments, wire transfers, and bundles of cash sent through the mail.

Given the success and profitability of the Darknet scheme, Wilson repeatedly hit limits, set by his distributor, on the amount of prescription drugs that he could obtain and provide to Burgamy. Consequently, in or about October 2019, Burgamy and Wilson developed an attack plot known as "Operation Firewood" to break into, steal the opiate supply of, and firebomb Cody's U-Save Pharmacy, a competing pharmacy located in Auburn, Nebraska, by using explosives. The goal of the attack plot was to destroy Wilson's local competition, which Burgamy and Wilson believed would increase the volume of prescription drugs that Wilson's pharmacy could obtain, thereby allowing Burgamy and Wilson's drug trafficking operation to continue and expand.[1]

Wilson created a "getaway" map and escape routes for Burgamy to use to help him evade law enforcement detection after the firebombing. Wilson instructed Burgamy to make the firebombing appear as though it was committed by a fictitious "pissed off husband" who learned about a fabricated affair involving the husband's wife and a pharmacist from the victim pharmacy.

Burgamy assured Wilson that if anything happened to him, he would take care of Wilson's "family and bills," and Wilson agreed to safeguard Burgamy's life insurance information in the event Burgamy was killed during the attack. Burgamy and Wilson also agreed that Burgamy and another individual would carry multiple firearms during the attack and use explosives, specifically Molotov cocktails enhanced with Styrofoam as a thickening agent, to burn the victim pharmacy down. During Burgamy's arrest, law enforcement located eight unsecured fully loaded firearms in Burgamy's residence, including AR-15 assault rifles and numerous high capacity magazines.

---

[1] For example, on January 8, 2020, Wilson explained to Burgamy: "My wholesaler looks at my volume and determines how much oxy I can order every 30 days. Right now my limit is about 60,000 mg per month, so if he [referring to Burgamy's alleged firebomb partner] wants 1000 of the 30mg that's 50% of my allotment right there. But, if I get all the pharmacy business, they'll bump my allotment up to 250k mg or so, which means I can order 1000 of the 30s every month and still have enough room left over for my legitimate patients."

## II.      APPLICATION OF THE SENTENCING GUIDELINES

The government agrees with the U.S. Probation Office's calculation of the Total Offense level as 37.  PSR ¶ 58.  Taken together with a Criminal History Category I, Burgamy's applicable Guidelines range is 210 to 262 months' imprisonment.  *Id.* ¶ 93.

The government concurs with Probation that the enhancement under Section 2D1.1(b)(12) applies, which involves a two-level increase "[i]f a defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance," which includes storing a controlled substance for distribution.  U.S.S.G. § 2D1.1, cmt. n.17.  The Application Note to the enhancement also makes clear that "premises" includes a building, room, or enclosure.  *Id.*

Indeed, courts have held that the Guideline applies to buildings used for other purposes, so long as the drug activity was one of the primary purposes of the premises.  *See, e.g., United States v. Messer*, 655 F. App'x 956, 958-59 (4th Cir. 2016) (unpublished) (finding sufficient that a barn, although also used for horses, was used to store drugs, proceeds from drug trafficking, and firearms derived from trafficking, and that the defendant "sometimes conducted his drug transactions in the barn"); *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) ("Likewise, we conclude, § 2D1.1(b)(12) applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question.").

Paragraph 6 of Burgamy's signed Statement of Facts notes that Burgamy controlled his Darknet enterprise from his residence, fulfilled over 2,500 Darknet prescription drug orders from his residence, stored and packaged all of the prescription drugs that he illegally obtained from Wilson in his [Burgamy's] residence, and transported these prescription drugs, sold through the Darknet, from his [Burgamy's] residence to U.S. Post Office boxes.

The government has provided Probation and defense counsel with photographs of certain items located in Burgamy's garage and office space in his leased residence.  Probation correctly recognized that one of the primary uses of the garage and office space was to receive, store, advertise (through the Darknet), and illegally distribute prescription medications.  The photographs, which were taken by the FBI on the day of Burgamy's arrest, show that in the garage and office space, Burgamy had thousands of U.S. mail priority envelopes, a cash counting machine, a label printer used to print mailing labels for customers associated with his Darknet business, other packaging material that he used to conduct drug trafficking activities, and notebook entries reflecting how he fulfilled orders from his residence, along with the types of materials he needed to sustain his Darknet enterprise.  As Probation noted, Burgamy's live-in partner informed law enforcement that she and Burgamy's child were not allowed to enter Burgamy's work area, which further demonstrates beyond peradventure that Burgamy controlled access to those areas.

## III.    SECTION 3553(a) FACTORS

After calculating the appropriate advisory Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.  Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).  Based on a careful consideration of those

factors, a term of imprisonment of **15 years (180 months)** is reasonable in this case.

### A.      The Firebombing Attack Plot

The serious nature of this case cannot be overstated.  Following a court-authorized search

of Burgamy's residence during his arrest on April 9, 2020, the FBI recovered a black leather bound

notebook.  The inside of the notebook has the words "NPRX Private" handwritten on it.  In a

journal entry dated January 10, 2020, the following text is handwritten in a section labeled "Top

Priority": "Hyrum [referring to Wilson] responded w/ no more orders until Operation Firewood is

complete.  F**K!!!!  Make plans (extremely thourough [sic] to fullfill [sic] the f**king plan)."

On the adjoining page, the word "Nebraska" is handwritten in large letters, along with the

following: "Make The Plans & Set A F**king Date.  On the same page, in a section labeled "List

of Items Needed," the following list is handwritten:



Burgamy assured Wilson, "I'll get the mission done for you."  Wilson responded, "I'll leave operations up to you then."  Burgamy replied, "We make a great team so I'm gonna need some help."  While referring to the owner of the victim pharmacy and offering his assistance, Wilson stated, "Just hope that f\*\*ker doesn't try to bounce back too quickly.  It should take a few months just to get the insurance sorted out, then another few months for repairs and rebuilding.  He just needs to take the insurance payout and retire to a beach somewhere."

**B.      Burgamy Recruited a Second Conspirator to Help Conduct the Attack Operation**

The following further demonstrates that Burgamy's discussions with Wilson about the intended firebomb attack, along with their meticulous operational planning, were not idle chatter.  In fact, Burgamy and Wilson agreed that Burgamy and another individual would carry multiple firearms during the attack, and use explosives, namely Molotov cocktails enhanced with Styrofoam as a thickening agent,[2] to burn the Victim Pharmacy down.  While Burgamy and Wilson were planning the attack, Burgamy sent the following messages to another individual (referenced below as "Conspirator-2"), who Burgamy successfully recruit to help conduct the operation.[3]

Burgamy sent Conspirator-2 a picture of bullet holes made on a target sheet following his visit to a shooting range.  Conspirator-2 told Burgamy that he should take him to the range so that Conspirator-2 can "get some practice in just in case we have to put in some work."  Burgamy informed Conspirator-2 that they can definitely shoot before they go to Nebraska [referring to the intended firebomb attack].  Conspirator-2 responded, "Got you bro."

---

[2] The effects of a Molotov cocktail can be enhanced by the addition of certain materials to the flammable liquid.  For example, when Styrofoam is added to gasoline in a Molotov cocktail, the Styrofoam dissolves into a flammable jelly-like substance.  When the Molotov cocktail is thrown and the container breaks, this substance ignites and sticks to surfaces with an extended burning time.  This could potentially result in greater injury or damage to the target.

[3] The FBI and USAO-EDVA located Burgamy's messages with Conspirator-2 after Burgamy's electronic devices were lawfully searched following his April 9, 2020 arrest.

Following an illegal prescription drug transaction involving Conspirator-2 and others, Burgamy stated, "If that fool ever did try to walk up on my car I would 100% lay him down. Plus i know if I did have to go to court I been in the Freemasons for 7 years now so all I would have to do is stand a certain way and as long as the judge is a Freemason which 99% are then they took an obligation to keep me out of trouble. Same way I beat that dui when i was on top a week old Benz s500." Burgamy also sent Conspirator-2 a picture containing four firearms, what appeared to be thousands of bullets, numerous magazines, including extended magazines, and two hard face masks; a picture showing Burgamy shooting at a range with a human skeleton target sheet; a picture of three firearms laid out by his feet; a picture (not shown below) of a Freemason Masonic ring; and a picture (not shown below) of a Scar 17 heavy .308 Winchester firearm that Burgamy told Conspirator-2 was his "new baby."





Burgamy texted Conspirator-2 about the firebomb attack plot and stated the following: "So for our trip the only thing you will need to bring is like 2 extra sets of clothes because it's gonna take all weekend to get there and back.  We will grab a rental because we go and everything else we will buy along the way like gloves and boots I'll buy them we always torch after every job.  I'll also get you a nice pair of 5.11 pants that are black that you can keep for next job."

Burgamy stated that Conspirator-2 should be measured for a plate carrier to ensure Burgamy can "order the right size chest rig."  Burgamy also stated that having body armor for the firebombing plot is "[k]ind of like life insurance policy.  Pray that we never need but a lot better to have body armor and never need it then need that s [explicative] and not have."

Burgamy sent several photographs to Conspirator-2 and stated: "Here check this out so you know for real what kind of nice opportunities for big jobs I get like the one just you and I will handle in bumfu [explicative] and this s [explicative] will keep money in your pocket and keep

9

you out of trouble.   That's why we do the s [explicative] perfect every single time."   The

photographs included: numerous sealed prescription pill bottles; stacks of cash; several firearms;

what appeared to be thousands of bullets; extended magazines; two hard face masks; and a "Profit

& Loss" chart in which Burgamy claimed he had grossed nearly $1 million USD.

**C.      Burgamy and Wilson's Operational Attack Planning**

In the month prior to his arrest, Burgamy wrote, "Here's how I'm going to do it," and

recounted his attack plan to Wilson, as shown in the following text messages.





As shown in the above message, Burgamy informed Wilson that they "already have all gear."  Burgamy then sent Wilson an image of two masks and an image of Burgamy's car trunk full of guns, including many of the firearms that were seized from Burgamy's residence in April 2020.

11

At one point, Burgamy asked Wilson for assistance should the planned attack encounter any problems.  Burgamy stated, in part, "if shit did go south I'm leaving him escaping and hiding out h til [sic] you get me then flying home."  Wilson replied, "For sure.  I'll get you wherever you are and say you've been staying with me for a few days."  Burgamy responded, "Plus we'll get money now and later so it's worth the split to me.  I'll get away.  I don't think any hero is going to be chasing me down with those 308 Winchester's [rifle cartridges] zinging by their head."  Additionally, Burgamy repeatedly used racist, vile, threatening, and shameful language when discussing the attack operation with Wilson.  The following is just one example out of many:



On March 3, 2020, Wilson informed Burgamy that he had a "getaway" map, which contained escape routes to help Burgamy evade law enforcement detection following the attack. Wilson then described for Burgamy his recollection of the layout of the pharmacy.

On March 4, 2020, Wilson sent Burgamy the requested map with manually drawn lines of two different colors, as well as instructions that were added to describe how Burgamy can quickly drive to the Kansas and Missouri borders following the firebombing of the victim pharmacy. Wilson informed Burgamy that, "Mustache is the [victim] pharmacy, glasses are the cop shop."



On March 31, 2020, Burgamy and Wilson began speculating about the threat of a third party speaking to the government about the attack plot. Burgamy stated, "All I know [is] the feds don't charge unless their sh*t sticks." Wilson replied, "I'm not worried. I'll work double time to get my books in order just in case he drops my info . . . And if they do come knocking, those FedEx boxes were business books and gifts for your daughter."

In the days leading up to his arrest, Burgamy posted the following message on his Darknet vendor page: "Even with Corona Virus the shop is running at full speed."  Burgamy and Wilson also discussed obtaining hydroxychloroquine and chloroquine for illegal distribution purposes in order to further profit from the ongoing COVID-19 outbreak.  Prior to Burgamy's arrest, Burgamy and Wilson fully intended on the attack occurring after COVID-19 restrictions were lifted.

In summary, among other acts taken in furtherance of the attack plot, Burgamy:

    a.    crafted the blueprint and details of the attack plot, including how he planned to obliterate the victim pharmacy;

    b.    recruited another individual to participate in the attack, agreed to bring that individual to a shooting range for practice before the operation, and instructed that individual to get measured for a plate carrier so that Burgamy could procure body armor for their collective use;

    c.    emphasized to Wilson that he would never surrender to law enforcement, that if anyone showed up during the firebombing, he would "blast [his] fu**king way out," and that he would shoot bullets at anyone who attempted to confront or apprehend him, including the owner of the victim pharmacy;

    d.    assured Wilson that if anything happened to him, he would take care of Wilson's "family and bills" and hoped Wilson would do the same if Burgamy was killed during the attack;

    e.    asked Wilson to continue mailing him prescription drugs, including opioids, that would be sold to an individual who Burgamy stated was prepared to help conduct the attack with him;

    f.    instructed Wilson to create a "getaway" map and escape routes, which Wilson sent through encrypted channels for Burgamy's use to help him evade law enforcement detection following the attack;

    g.    informed Wilson that he had stockpiled a cache of firearms and all of the necessary equipment needed to conduct the attack;

    h.    assured Wilson that the attack would happen and stated, "You know I'll take care of it" and "You'll be sole pharmacy, you got my word;" and

    i.    instructed Wilson to keep his life insurance policy information in a safe place in the event Burgamy was killed during the firebomb attack.

Regarding the Defendant's history and characteristics, Burgamy is a 33-year-old United States citizen who graduated from high school and attended, but did not complete, college. PSR ¶¶ 67, 82-83. Burgamy attended private school for elementary, middle, and high school. *Id.* Other than high blood pressure, which he has managed through diet and exercise, Burgamy indicated that his overall general health is good and that he has no history of any serious or chronic medical conditions or illnesses. *Id.* ¶ 74. He also reported owning and operating a consulting business that had profited over $100,000 by 2019. *Id.* ¶ 84.

Accordingly, Burgamy's positive upbringing and ample career opportunities should weigh in favor of holding him to an exacting standard. The government recognizes that Burgamy only has one prior criminal conviction. *See id.* ¶ 60. However, there is nothing in his background that comes close to explaining the destructive and maniacal conduct that brings him before the Court. It is Burgamy's serious crimes that should be the Court's lodestar at sentencing. The Defendant is an intelligent individual who had the power to make his own choices, and repeatedly made the wrong decisions (until he was caught) that have brought him before this Court.

It is true that Burgamy has suffered from substance abuse issues. *Id.* ¶¶ 76-80. However, suffering from an addiction, as regrettable as it is, does not allow an individual to commit crimes with impunity – especially those that involve planning destructive and potentially deadly attacks and illegally distributing 19,000 dosage units of prescription medications and fulfilling over 2,500 Darknet drug orders, including opioids, which have ravaged our communities during the opioid epidemic. According to the Centers for Disease Control and Prevention, 67,367 drug overdose deaths occurred in the United States in 2018. Nearly 70% of those deaths involved an opioid.

Burgamy and Wilson's actions risked the lives of anyone who purchased these highly addictive and potentially lethal drugs. In fact, had any of the more than 2,500 Darknet sales

15

resulted in the death or serious bodily injury (including a non-fatal overdose) of even one person, both Burgamy and Wilson would be subject to 20-year mandatory minimum sentences under 21 U.S.C. § 841(b)(1)(C).  It is by pure luck, rather than because of any actions they took, that Burgamy and Wilson are not facing 20-year mandatory minimum sentences in this case.

A significant sentence is also necessary for deterrence purposes to send a strong message that preparing to commit a violent attack involving explosives will face a severe punishment in the Eastern District of Virginia.  In fact, Burgamy and Wilson's arrests were highlighted on an Internet site dedicated to Darknet market busts, where nearly nine thousand members, and anyone else who might be interested, learned about their potentially deadly firebomb attack plans. *See* https://www.reddit.com/r/DNMBusts/comments/g4bgvp/pharmacist_arrested_in_plot_to_firebo mb_a_rival/.

Just as news of Burgamy and Wilson's arrests and subsequent guilty pleas spread quickly in the media,[4] news of their sentence could make a similar impression.  This impact is an important product of convictions in a *sui generis* prosecution involving explosives, firearms, the Darknet, prescription opioid trafficking, cryptocurrency, and sophisticated money laundering.  It would be undermined by the exceedingly light sentence for this type of potentially deadly conduct that the government anticipates both Defendants will ask of this Honorable Court.

---

[4] *See, e.g.*, https://abcnews.go.com/US/wireStory/feds-online-drug-dealer-planned-bomb-nebraska-pharmacy-70128388;

https://www.nytimes.com/2020/04/18/us/nebraska-pharmacist-hyrum-wilson.html;

https://omaha.com/news/crime/feds-nebraska-pharmacist-virginia-drug-dealer-plotted-to-blow-up-rival-pharmacy-in-auburn/article_1639dc7f-55b9-545f-ba2a-35770ac28389.html;

https://www.washingtonpost.com/national/pair-pleads-guilty-in-plot-to-firebomb-nebraska-pharmacy/2020/07/10/23055bb0-c2e0-11ea-8908-68a2b9eae9e0_story.html.

Burgamy and Wilson's destructive crime spree in this case is chilling.  Their operational attack plans and thirst for extreme violence clearly demonstrates that they pose a significant threat to the public safety of the United States.  Burgamy and Wilson's maniacal conduct is emblematic of lawlessness, displays extreme propensity for violence, and demonstrates that they fully intended to commit a violent attack using explosives on a pharmacy in Nebraska.  And if anyone stood in their way, Burgamy himself stated, without objection from Wilson, that he would "blast [his] fu\*\*king way out" and shoot bullets at anyone who attempted to confront or apprehend him, including the owner of the victim pharmacy.

Had law enforcement not uncovered and successfully thwarted the firebombing plot, Burgamy and Wilson's intended actions would have been devastating, potentially leading to the loss of innocent lives.  Their brazen conduct, level of vitriol, and attraction to violence call out for substantial sentences, particularly for deterrence purposes and to protect the public.  For Burgamy, a sentence of 15 years' imprisonment is appropriate given that he served as the criminal mastermind of the intended attack operation, along with his other serious offenses of conviction.

## CONCLUSION

For the foregoing reasons, the government believes that its sentencing recommendation of **180 months' imprisonment** for Burgamy is sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    /s/ Raj Parekh
Raj Parekh
First Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia

17

2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
raj.parekh@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter.  I further certify that I will provide a copy of the foregoing to the United States Probation Officer assigned to this matter.

 /s/  Raj Parekh
Raj Parekh
First Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
raj.parekh@usdoj.gov