IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:20CR150 |
| | ) | Hon. T.S. Ellis, III |
| | ) | |
| WILLIAM BURGAMY | ) | Sentencing: November 20, 2020 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S POSITION ON SENTENCING

William Burgamy comes before the Court for sentencing having accepted responsibility for conspiracy to distribute controlled substances, money laundering proceeds of the conspiracy to distribute, and conspiracy to use Molotov cocktails. The United States Probation Office ("Probation") has assessed the guideline range to be 210 to 262 months–17.5 to 21 years–for these offenses. While Mr. Burgamy acknowledges that the charges are serious, the underlying facts show that this guideline range is disproportionate to his offense conduct for the reasons that follow.[1] Indeed, the government has also requested a sentence below this guideline range.

First, Mr. Burgamy offers one objection to the PSR's assessment of a 2-level enhancement under USSG § 2D1.1(b)(12), because he did not use the townhome he shared with his partner primarily for the purpose of distributing controlled substances.

---

[1] The government has also requested a sentence below this guideline range.

1

Second, a variant sentence is appropriate here because, distilled to its essence, this is a drug case. Mr. Burgamy sold drugs on an encrypted online network called the "darknet"; for money at first, and later primarily to feed his own long-standing addiction to opiates. If Mr. Burgamy were sentenced like the defendants in the dozens of drug trafficking cases that are heard before the Court each year—under USSG § 2D1.1—his guideline range would be 135 to 168 months. Yet Mr. Burgamy's guideline range is enhanced four levels by application of the money laundering guideline, USSG § 2S1.1, resulting in a substantially higher guideline range.

Third, count four (conspiracy to use Molotov cocktails) is an inchoate offense and does not operate to increase the guideline range nor should it. Mr. Burgamy did not come close to using Molotov cocktails and he did not take any substantial steps to carry out the wildly ill-conceived plan he and his co-defendant hatched while Mr. Burgamy was in throes of substance abuse. For these reasons, this count—as sensational as it sounds—should not dramatically increase Mr. Burgamy's sentence.

The defense respectfully submits that a sentence of 108 months (9 years)—a sentence which falls within the guideline range were USSG § 2D1.1 applied and the defense objection granted—is sufficient but no greater than necessary to meet the goals of sentencing, especially given Mr. Burgamy's minimal record[2] and the nature of the conduct for which he has accepted full responsibility.

---

[2] Mr. Burgamy has one prior 2010 conviction for driving while impaired. PSR ¶ 59.

## BACKGROUND

From the outset, Mr. Burgamy made no excuses for his conduct in this case. He accepted responsibility on the day of his arrest and he continues to accept the consequences of his choices. But in order to understand why Mr. Burgamy, an intelligent and hardworking young man in the prime of his life, would engage in the conduct that led him to this day—facing years in prison—it is important for counsel to identify the catalyst behind Mr. Burgamy's winding path towards self-destruction. Namely, a ravaging addiction to opiates that took root when he was just a teenager.

William Burgamy's story in many ways has become an all too familiar one: A middle-class suburban childhood upended by an addiction to opiates that devastated him and his family, followed by repeated cycles of recovery, struggle to maintain sobriety, and relapse. Prior to his offense in this case, Mr. Burgamy had been sober for six years. He was together with his fiancée, Christine Weinbrecht, and the two had a newborn baby. In the summer of 2019, Mr. Burgamy met Mr. Wilson on an online gaming forum. The two developed an exclusively online friendly relationship and together hatched a plan to sell some of the drugs that Mr. Wilson, a Nebraska pharmacist, obtained legally. Mr. Burgamy and Mr. Wilson sold the pharmaceutical drugs on the darknet for Bitcoin—a legal form of virtual currency commonly used on the internet. Not surprisingly, with his sudden and unfettered access to pills, Mr. Burgamy relapsed and began asking Mr. Wilson to send him pills for personal use. In no time, Mr. Burgamy was spending upwards of $700 a day to feed his own habit. In order to make up for the financial loss and in the grips of addiction, he began

buying heroin at a cheaper cost off the streets. As his addiction took hold once again, Mr. Burgamy began abusing pain pills and heroin all hours of the day and night. While in the throes of substance abuse, he and Mr. Wilson concocted a wildly ill-conceived plan to firebomb a competing Nebraska pharmacy so that Mr. Wilson could access more prescription opiates. Mr. Burgamy acknowledges that when he was messaging with Mr. Wilson about the scheme, he fully intended to carry it out. That said, Mr. Burgamy was under the influence of powerful drugs which made him manic, irrational, and wildly erratic. Now, sober and clearheaded, Mr. Burgamy understands how senseless and dangerous the plan was. Mr. Burgamy put it best when he wrote to the Court: "I thank God that this wreckless [sic] plan wasn't carried out and no one was physically hurt."[3]

Mr. Burgamy has hit rock bottom in every sense, accepts responsibility, and is committed to emerging from his imprisonment a changed man. To that end, he pleaded guilty early and without reservation, has an exemplary track record at the Alexandria Detention Center[4], and has expressed his remorse in private conversations with loved ones. As one of his friends wrote in a letter to the Court: "In our conversations about his troubles, [Mr. Burgamy] has never once tried to defend, minimize, or explain away his activities. Nor did he ever try to shift moral blame on

---

[3] Letter of William Burgamy, attached as Exhibit 3.
[4] See Letter of Counselor Collin O'Bryan and Certificate, attached as Exhibit 2.

others. . . I could hear in his voice that he is ashamed of not only relapsing on drugs, but the consequences the using created."[5]

### OBJECTION TO PSR'S APPLICATION OF ENHANCEMENT UNDER USSG § 2D1.1(b)(12).

Mr. Burgamy moved to the townhome he shared with his partner, Ms. Weinbrecht, months before he met Mr. Wilson online. The two lived there, shared meals there, had their baby girl there. The primary purpose of the townhome was residential. Yet, at the government's request, the PSR assessed a two-level increase for maintaining "a premises for the purpose of manufacturing or distributing a controlled substance." USSG § 2D1.1(b)(12). The commentary to the guideline makes clear that the enhancement should not be applied in this case, where distributing controlled substances was not the "primary or principal" use of the premises and where, instead, the distribution was an "incidental or collateral" use of the premises. USSG § 2D1.1, comment 17. As such, Mr. Burgamy respectfully objects to the enhancement. If the Court grants his objection, the total offense level for Count 1 (conspiracy to distribute controlled substances) is 31, after adjustment for acceptance of responsibility, *see* PSR ¶ 5, resulting in a guideline range of 108 to 135.

### SENTENCING ARGUMENT

Fifteen years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d

---

[5] Letter of John Myers. Letters in support of Mr. Burgamy are attached hereto as Exhibit. 1.

Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Instead the Court is to impose a sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id.* Moreover, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47. The Supreme Court's decisions in *Gall, Cunningham, and Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines. The Court should exercise its broad discretion in this case and impose a sentence below the Guidelines for the reasons that follow.

I. **Mr. Burgamy's History and Characteristics**

    a. **A Typical Childhood**

Mr. Burgamy ("William" or "Billy") was born in 1987 in Baltimore, Maryland and was raised in the Baltimore suburbs. In many ways, he had a typical suburban childhood. He attended Catholic schools and excelled at sports, baseball in particular. He started on a little league when he was five years old, and by 11 he was a star on a metro league that traveled around the country to play games.



Mr. Burgamy with his parents in 1991



Mr. Burgamy with his father in his high school baseball uniform

Growing up, William was close to both of his parents, though he had a somewhat fraught relationship with his father, who had high expectations for William and used corporal punishment when he was "disappointed" in William. PSR ¶ 68. As a child, William spent most of his time with his grandparents and many cousins due to his parents' work schedules. He became known as the family caretaker, the guy who "will help anyone."[6] William's uncle writes, "Billy was the first of seven grandchildren in our family. He was a big brother to all the younger children. He was exceptionally kind to all of his cousins."[7] His friends and family describe William as loving and loyal to all of his family members. His aunt recalled that when her daughter lost her own father, William was the one who jumped out of line at the funeral procession to comfort her.[8]

William graduated from Archbishop Curley High School in 2005 and enrolled in community college thereafter. For many years, he worked with his father and uncle at his father's company, BWC Interiors. PSR ¶ 88. However, when he was in his early twenties, William's uncle, grandfather, and father passed away, all within a span of four years. The years that followed were challenging for William as he coped with the loss of his own father and two men whom he regarded as father figures.

B. Descent into Addiction

When Mr. Burgamy was in college, he injured his knee playing baseball. His teammate gave him a pill for pain and, knowing nothing about opiates at the time,

---

[6] Letter of Lisa Burgamy.
[7] Letter of Benjamin Davella.
[8] Letter of Tammy Conner.

Mr. Burgamy took it. Soon, like hundreds of thousands of Americans who have succumbed to opioid addiction by way of prescription pills, Mr. Burgamy was hooked. Unfortunately, the pills were easy to obtain at the time. Indeed, a DEA database that tracks the legal sale of pain pills shows that a handful of pharmaceutical companies were flooding the market with opioid pain pills in 2006—the same year that Mr. Burgamy took his first pain pill.[9] Experts now conclude that the saturation of 76 billion legal pills into the market resulted in an opioid epidemic, which resulted in nearly 100,000 deaths between 2006 and 2012.[10] Of course, now the tragic and far reaching impacts of the prescription pill crisis are well documented. Once William became physically addicted to the pain pills, when he was without the pills, he experienced the common effects of withdrawal including extreme anxiety, depression, nausea, chills, diarrhea, profuse sweating, and extreme joint pain.[11] When he could no longer afford the pills he needed to feel better, he, like many Americans who

---

[9] Scott Higham, Sari Horwitz, and Steven Rich, *76 billion opioid pills Newly released federal data unmasks the epidemic,* WASH. POST (Jul. 16, 2019),
[10] *Id.*
[11] Research shows that when opiates travel through the bloodstream to the brain, the chemicals attach to opiate-sensitive neurons (brain cells). The linkage of these chemicals with the receptors triggers the same biochemical brain processes that reward people with feelings of pleasure when they engage in activities that promote basic life functions, such as eating. When opioids activate these reward processes in the absence of significant pain, they can motivate repeated use of the drug simply for pleasure. Over time, a person becomes dependent on the drug as the opioid receptors become less responsive to the drug. "Opioid dependence and some of the most distressing opioid withdrawal symptoms stem from changes in another important brain system, involving an area at the base of the brain." Thomas Kosten & Tony George, *The neurobiology of opioid dependence: Implications for treatment*, 1 SCIENCE & PRACTICE PERSPECTIVES , 13–20 (2002); *See also* Timothy B. Baker et al., *Pharmacologic and Behavioral Withdrawal From Addictive Drugs*, 15 CURRENT DIRECTIONS IN PSYCHOLOGICAL SCIENCE 232–236 (2006).

unwittingly became addicted to opiates through pain pills, resorted to buying heroin on the streets.

In 2010, one of William's uncles died from a heroin overdose and his grandfather, whom he regarded as a father figure, also died. His own father died in 2013 after a long struggle with COPD and cancer. William's mother writes that the death of his father was "a devastating blow to Billy's recovery."[12] William's drug abuse intensified in the aftermath of these tragedies until he went to treatment in 2010. The first treatment center he attended implemented a Scientology approach which he did not find effective. He quickly relapsed. In 2012, Mr. Burgamy successfully completed treatment again and was sober with one brief relapse until his offense conduct started in this case. As part of the treatment program, Mr. Burgamy moved to Florida, where he lived in a sober living home until he was deemed ready to live on his own. He stayed in Florida and met his partner, Christine, who was also in recovery for addiction to opiates.

Mr. Burgamy's experience of repeated attempts at treatment, sobriety, and relapse is a common reality for people suffering from opiate addiction. Research and cumulative evidence demonstrate that opioid addiction is a long-term disorder that compromises psychological functioning and is characterized by frequent relapse.[13] Indeed, a recent study showed that fewer than 30% of people with opiate addiction

---

[12] Letter of Lisa Burgamy.
[13] Yih-Ing Hser et al., *Long-Term Course of Opioid Addiction*, 23 HARVARD REVIEW OF PSYCHIATRY 76–89 (2015).

avoided relapse over a ten to thirty year observation period.[14] After a brief relapse in 2013, he maintained sobriety until 2019. During this time, Mr. Burgamy experienced a period of stability and hope: he established a consulting business, fell in love with Christine with whom he fathered a baby girl whom he adores, and moved back to Maryland.

## II. Nature and Circumstances of the Offense

In the summer of 2019, Mr. Burgamy met Mr. Wilson on an online gaming forum. The two bonded over their shared passion for entrepreneurship. Shortly after connecting online, they were discussing business plans over text and email. As the Court is well aware, Mr. Wilson was a Nebraska pharmacist and eventually the two hatched a plan to illegally sell prescription opiates Mr. Wilson obtained as a pharmacist. Mr. Wilson sent Mr. Burgamy the drugs and Mr. Burgamy sold the drugs on the darknet for Bitcoin–a legal cryptocurrency commonly used on the internet and darknet. But not surprisingly, once Mr. Burgamy had unfettered access to prescription pills, his addiction once again took hold and took over. During the six months he was selling and using drugs on the darknet, Mr. Burgamy would occasionally try to stop, but the fear of withdrawal symptoms, which one opiate addict described as "physical torture. . . like coming undone,"[15] would compel him to use

---

[14] Id.

[15] Alex Hogan, *Watch: 'Like you're living in hell': A survivor on what opioid withdrawal did to his body*, Statnews (May 25, 2016), https://www.statnews.com/2016/05/25/opioid-addiction-withdrawal-survival/.

again.[16] Mr. Burgamy describes similarly painful symptoms of withdrawal: "it was like my skin was crawling and someone was shoveling out my insides."[17]

Soon, Mr. Burgamy was using many of the pills Mr. Wilson sent him for personal use, and using heroin he bought off the street. It was in his altered state that Mr. Burgamy and Mr. Wilson hatched a plan for Mr. Burgamy to destroy a rival pharmacy in Nebraska so that Mr. Wilson could maintain his supply of pharmaceuticals. The two exchanged wild and fantastical text messages about the plot over the course of several months. Tellingly, however, <u>Mr. Burgamy never actually traveled to Nebraska. He never purchased the ingredients necessary to make an explosive</u>. It was as if some figment of his sober, rational self was preventing him from going through with the trip. Now that he is clearheaded, he is relieved that the two never carried out, to use Mr. Burgamy's words, their hair-brained, reckless plan.

---

[16] Again, Mr. Burgamy is not alone in his fear of withdrawal symptoms. Self-reporting from opioid-dependent individuals and mounting evidence demonstrate that withdrawal symptoms and fear of withdrawal serve as motivating factors for continued or reinitiated substance use. Timothy B. Baker et al., *Pharmacologic and Behavioral Withdrawal From Addictive Drugs*, 15 CURRENT DIRECTIONS IN PSYCHOLOGICAL SCIENCE 232–236 (2006).

[17] Letter of William Burgamy. The symptoms of opiate withdrawal are well-documented. The DSM-5 (Diagnostic and Statistical Manual of Mental Disorders) provides a criteria of physical symptoms which can include: "yawning, rhinorrhea, perspiration, dilated pupils, anxiety and restlessness, nausea and vomiting, diarrhea, increased heart rate or blood pressure, as well as a host of flu-like symptoms such as chills, joint and muscle aches, and increased body temperature." J.l. Scavone et al., *Cannabinoid and opioid interactions: Implications for opiate dependence and withdrawal*, 248 NEUROSCIENCE , 637–654 (2013).

The government will surely emphasize the number of firearms recovered from Mr. Burgamy's home. Mr. Burgamy does not deny that prior to his arrest, he was a firearms enthusiast, and felt passionately about his Second Amendment right to bear arms. To that end, he lawfully purchased many firearms and had a concealed carry permit in the state of Maryland. His text conversations show that he legally purchased several firearms after Democrat Ralph Northam was elected governor of Virginia—months before he began selling drugs on the darknet—because he feared that the election signaled that stricter gun control laws would soon be enacted. Mr. Burgamy fully acknowledges that while he legally purchased his firearms, he did not safely maintain his firearms in his home, and he carried a firearm with him when he went to pick up the substances Mr. Wilson sent him.

### III. Count Four—an Inchoate Offense--Should Not Significantly Increase Mr. Burgamy's Sentence.

The facts of this case are no doubt unique and eye-catching. While it is impossible to find factually similar cases, several other cases involving conspiracy to use explosives provide guidance as to what impact Mr. Burgamy's discussions with Mr. Wilson about their plans should have on his overall sentence. In *United States v. Valdez*, the defendant pleaded guilty to one count of Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing or Intending that it be Unlawfully Imported into the United States, in violation of 21 U.S.C. §§ 959(a), 963. No. 1:12CR67, Dkt. No. 23 at 1 (E.D. Va. May 14, 2013). The Statement of Facts shows that the defendant met with a confidential source in El Salvador in order to negotiate the terms of a weapons-for-narcotics exchange. *Id*, Dkt. No. 24 ¶ 2. During this meeting, the

13

defendant provided the source with a sample of C-4, an explosive powder. *Id.* The defendant later told the source that he would exchange 100 kilograms of cocaine in exchange for weapons, including 400 M-16 rifles. *Id.* ¶ 3. The defendant and three of his conspirators also met with the source in El Salvador in order to negotiate the purchase of 60 kilograms of cocaine, which the defendant said he planned to eventually import into the United States for resale. *Id.* ¶ 4. The defendant ultimately received an 84-month sentence, below the advisory guidelines range of 108-135 months and the government's recommendation of 120 months. *Id.*, Dkt. No. 31 at 1; Dkt. No. 34 at 2.

Two other cases in this District further suggest that Mr. Burgamy's sentence should not be significantly increased because he did not come close to completing the firebombing plan with Mr. Wilson.[18] In *United States v. Jones*, No. 3:07CR170, and *United States v. Sawyer*, No. 3:07CR172, the defendants pled guilty to Conspiracy to Destroy, by Fire or an Explosive, a Vehicle or Property used in Interstate Commerce, in violation of 18 U.S.C. § 371. No. 3:07CR170, Dkt. No. 7 (E.D. Va. May 11, 2007); No. 3:07CR172, Dkt. No. 7 (E.D. Va. May 30, 2007). There, the defendants and three friends purchased materials to create an improved explosive device ("IED"), fashioned the IED using shrapnel that would have caused serious bodily injury to any person nearby the detonation, placed the IED inside a portable toilet, and detonated it. No. 3:07CR170, Dkt. No. 8; 3:07CR172, Dkt. No. 8. Fortunately, nobody was injured and

---

[18] Indeed, the total offense level for count four is 16, which would yield a guideline range of 12 to 18 months after adjustment for acceptance of responsibility.

14

the fire department extinguished the fire caused by the detonation. *Id.* Yet unlike in this case, the device was actually created, detonated, and filled with shrapnel intended to cause serious bodily injury or death. *Id.* Both defendants were sentenced to 24 months, the low end of the 24-30 month advisory guidelines range.

This case, by contrast, involves *a plan t*o use explosives and guns. But Mr. Burgamy never drove to Nebraska, he never met Mr. Wilson in person, and he never purchased materials to create a Molotov cocktail, whereas in *Valdez* the defendant actually transferred explosive powder and in *Jones* and *Sawyer*, the defendants detonated an explosive device that could have seriously injured someone. And while Mr. Burgamy intended to carry out the firebombing when he was messaging about it with Mr. Wilson, he was under the influence and irrational when he was having these discussions. Facing the prospect of being cut off from Mr. Wilson's supply of opiates, he was willing to do almost anything to feed his drug habit, as is often tragically the case with people suffering from opiate addiction.

### IV. A Sentence Slightly Below the Guideline Range that Results if USSG § 2D1.1 Were Applied is Appropriate Here, Where Mr. Burgamy's Primary Offense was Distribution of Controlled Substances.

This is a drug trafficking case. Were it sentenced under the drug trafficking guideline, USSG § 2D1.1, and the advisory range would be 135-168 months.[19] And

---

[19] If the drug distribution guideline, USSG § 2D1.1, were applied, and the defense's objection to the two-level enhancement under § 2D1.1(b)(12) were sustained, Mr. Burgamy's total offense level after adjustment for acceptance of responsibility would be 31, resulting in an advisory range of 108-135 months. Thus, the application of § 2S1.1 increases the total offense level by four levels and causes a significant increase in the advisory guidelines compared to § 2D1.1.

15

yet, the guideline range in this case is driven by the application of the money laundering guideline, USSG § 2S1.1, and results in a substantially higher range of 168 to 210 months (assuming the Court does not apply the § 2D1.1(b)(12) enhancement). PSR ¶ 43. Specifically, Mr. Burgamy receives a two-level enhancement under § 2S1.1(b)(2)(B) because he was convicted under 18 U.S.C. § 1956 and an additional two-level enhancement under § 2S1.1(b)(3) because the offense involved "sophisticated laundering." The sophisticated laundering enhancement applies because Mr. Burgamy received payments for the pills in Bitcoin, which he converted into U.S. dollars and transferred into his PayPal and Navy Federal Credit Union accounts. PSR ¶¶ 22-23. Bitcoin is a relatively new type of virtual currency traded on online marketplaces called "exchanges," which are similar to foreign exchange markets and enable Bitcoins to be traded for ordinary fiat currency.[20] Bitcoin is available to everyone and while it is a new currency, it is not inherently sophisticated and certainly not inherently criminal.

And so while the money laundering guideline drives Mr. Burgamy's guideline range, as a practical matter, money laundering was <u>not</u> the core component of Mr. Burgamy's conduct—the drug conspiracy was the core component of the crime. Indeed, the drug trafficking conspiracy is charged as Count 1 and each of the

---

[20] *See* John P. Kelleher, *Why Do Bitcoins Have Value?* Investopedia https://www.investopedia.com/ask/answers/100314/why-do-bitcoins-have-value.asp; Tal Yellin, Dominic Aratari, and Jose Pagliery, *What is bitcoin?*, CNN Aug. 8, 2018 https://www.money.cnn.com/infographic/technology/what-is-bitcoin/index.html.

16

remaining three counts refer back to the drug distribution conspiracy. *See* Doc No. 23 (Criminal Information). Moreover, money laundering could be charged in connection with the *vast majority* of drug distribution offenses because monetary transactions involving funds derived from unlawful activity is inherent to the crime of selling illegal drugs for currency. As such, a sentence that falls within the range yielded by application of USSG § 2S1.1 runs the risk of creating unwarranted sentencing disparities with other drug conspiracy cases in which the government did not elect to charge money laundering even where it could obviously apply.

The Department of Justice has itself acknowledged that determining the guideline range is no substitute for determining a sentence that is "appropriate [and] serve[s] the interests of justice," because the "technically applicable" guideline range can be driven by sentencing enhancements that "overlap[] . . . with the offense conduct," and can therefore result in advisory sentencing ranges that are "unduly high."[21] Mr. Burgamy does not dispute that the guideline provisions of USSG § 2S1.1 technically apply to him. But because his offense is—at its core—a drug distribution offense, he respectfully submits that a variant sentence that falls slightly below the guideline range that results from the application of § 2D1.1 would more fairly reflect his culpability and the core of his conduct in this case.

---

[21] *See Government's Supplemental and Amended Sentencing Memorandum, United States v. Roger J. Stone, Jr.*, Case No. 19-cr-18-ABJ, ECF No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can be driven by sentencing enhancements that "overlap[] . . . with the offense conduct," and can therefore result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors).

17

## CONCLUSION

At 33 years old, William Burgamy is a young man with much of his life ahead of him. He accepted responsibility early in this case and has been a model inmate throughout his detention at the Alexandria Detention Center.

As Mr. Burgamy expressed to the Court, he is grateful that his addiction did not kill him. He knows he can never return to drug use and he is committed to helping others who lose their way to addiction. He has a family that loves him and will support him when he is released. Indeed, his mother writes, "I am not giving up on him. My family and I love him and will always support him."[22] Though this case has some sensational facts, at its core, it is a drug case—a drug case involving an addict who lost his way and sold drugs mainly to supply his own habit.

The defense respectfully requests that the Court sentence Mr. Burgamy accordingly and submits that a sentence of 108 months followed by supervised release with a condition of drug treatment is more than sufficient to meet the goals of sentencing.

Respectfully submitted,

William Burgamy

By Counsel

\_\_\_/s/_____
Elizabeth Mullin
Virginia Bar Number 86668

---

[22] Letter of Lisa Burgamy.

        Assistant Federal Public Defender

        Office of the Federal Public Defender
        1650 King Street, Suite 500
        Alexandria, Virginia 22314
        (703) 600-0879 (T)
        (703) 600-0880 (F)
        Elizabeth_Mullin@fd.org (email)

### CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2020, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

        ___/s/_____
        Elizabeth Mullin
        Virginia Bar Number 86668
        Assistant Federal Public Defender